J-S18001-21
J-S18002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2188 EDA 2020 |

Appeal from the Decree Dated October 28, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000661-2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2189 EDA 2020 |

Appeal from the Order Dated October 28, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0002963-2017

BEFORE:   PANELLA, P.J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:                    **FILED AUGUST 9, 2021**

---

[*] Retired Senior Judge assigned to the Superior Court.

In these consolidated appeals,[1] D.N. ("Father") appeals from the order and decree, both entered October 28, 2020, in the Philadelphia Court of Common Pleas.[2] In its order, the court changed the permanent placement goal of his child, S.S.N. a/k/a S.N. ("Child"), born in March of 2013, from reunification to adoption. By decree, the court involuntarily terminated Father's parental rights to Child. Upon review, we affirm both the order and the decree.

The Department of Human Services ("DHS") for the City of Philadelphia first became involved with Child in September of 2017, when it received a General Protective Services ("GPS") report alleging that Child, an older sibling,[3] Maternal Grandmother, and Mother were residing in a home that was not appropriate for Child and her sibling. **See** Trial Court Opinion, 3/1/2021, at 1. Mother and Maternal Grandmother obfuscated Child's whereabouts for several months as DHS attempted to contact her. **See id.**, at 2-3.

In November of 2017, DHS filed a petition alleging that Child was dependent. An adjudicatory hearing was held for Child on November 15, 2017.

---

[1] We note Father properly filed separate notices of appeal for each docket in accordance with **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018). We have consolidated Father's two appeals *sua sponte* as they raise identical challenges to the court's order and decree.

[2] The court also involuntarily terminated the parental rights of ("Mother"). Mother has not separately appealed, nor is she a party to the instant appeal.

[3] The sibling is not a biological child of Father and is not a part of this appeal.

The trial court "determined that Child's whereabouts were unknown to DHS" and "discharged the … petition without prejudice[.]" ***Id.***, at 2. The court ordered "DHS to obtain an Order of Protective Custody ("OPC") for Child once she was located." ***Id.***

DHS eventually found Child in the care of a family friend ("Friend") in January of 2018. DHS determined that Friend was an appropriate caregiver and obtained an OPC on January 22, 2018, to place Child in Friend's care. That same day, a shelter care hearing was held for Child. The court lifted the OPC and ordered the temporary commitment to DHS to stand. Three days later, DHS re-filed a petition seeking to have Child adjudicated dependent. On January 29th, the trial court adjudicated Child dependent based on her parents' present inability to provide proper parental care and control. The court discharged the temporary commitment and fully committed Child to DHS. In addition, the court ordered that Child be removed from her placement at the time and she was subsequently placed in the foster home where she currently resides. ***See id.***, at 3.

During this entire time, Father was incarcerated, as he had been since 2015. He indicated he was found guilty of two armed robberies and has a release day of July 30, 2023. ***See*** N.T., 12/17/2019, at 66-67. The year of his convictions was the last time he saw Child in person. ***Id.***, at 70. Father did not attend or participate in any of the initial proceedings. ***See*** Trial Court Opinion, 3/1/2021, at 3.

In February 2018, the Community Umbrella Agency ("CUA"), under Turning Points for Children ("TPC"), held an initial Single Case Plan ("SCP") meeting. The SCP provided only one objective for Father: to maintain telephone contact with Child. *See id.*

From April of 2018 to July of 2019, numerous permanency review hearings were held for Child. Father did not attend or participate in any of these proceedings. At each hearing, the court determined that Child's placement continued to be necessary and appropriate, and Child would remain committed to DHS. *Id.*, at 3-4. Moreover, the court repeatedly found Father to be non-compliant with the permanency plan and ordered Father to maintain contact with Child.

On July 10th, at another permanency hearing which Father did not attend, the court determined that "minimal progress had been made towards alleviating the circumstances which necessitated Child's original placement." *Id.*, at 4. The court again found Father to be non-compliant and Child was ordered to remain committed to DHS. The court also directed that Father "maintain contact with CUA and engage in appropriate services to meet his SCP objective while incarcerated." *Id.*

Subsequently, on September 5, 2019, DHS filed petitions to voluntarily terminate Father's parental rights and change Child's permanency goal to adoption. Child had been adjudicated dependent for eighteen months at the time of the filing of the petitions. At an October permanency hearing, the court

ordered that Father be made available for the next hearing, which was a termination and goal change trial. *See id.*

The termination and goal change trial began on December 17, 2019. Father participated from State Correctional Institute at Pine Grove ("SCI Pine Grove") via telephone. Notably, Father testified that the only way he was able to contact Child was when Mother called him on her cellphone during supervised visits with Child. *See* N.T., 12/17/2019, at 71. He stated he had no contact with, or information about, the agencies involved. *See id.* He indicated the last time he spoke with Child was two months prior to the proceeding, and Mother told him that she was not allowed to bring her phone during the supervised visits. *See id.*, at 70. Following the testimony, the court held the decision for involuntary termination in abeyance to allow Father the opportunity to explore voluntary relinquishment of parental rights prior to the next hearing. *See id.*

The court then held a review hearing in June of 2020. Like before, Father did not participate. The court again ordered Child to remain as committed and that Father have telephone visits with Child. *See id.*, at 5.

On October 28, 2020, the court completed the proceeding for Child. Father participated via telephone. The court incorporated the notes of testimony from the December 2019 trial and the June 2020 permanency review hearing, although there was no testimony explicitly referring to the goal change or termination. *See id.* The court noted that the "CUA case

manager indicated that although CUA did explore voluntary relinquishment of parental rights with Father, Father refused." *Id.* The court then found there was clear and convincing evidence to change Child's permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351 and to voluntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). *See id.* The court issued the corresponding order and decree on the same day. These timely appeals followed.[4]

Initially, we note that Father lists errors only in the goal change order in the "Statement of Questions Involved" section of his appellate brief. *See* Appellant's Brief, at 3. However, a review of his argument section reveals that his issues only discuss the legal standards for termination of parental rights. *See id.*, at 7-20. A review of a dependency order changing the placement goal to adoption involves its own standard of review and an evaluation pursuant to Section 6351(f) of the Juvenile Act. *See In re N.C.*, 909 A.2d 818 (Pa. Super. 2006); 42 Pa.C.S.A. § 6351(f). As Father has failed to meaningfully develop any challenge to the goal change, he has waived those arguments. While Father also technically waived his challenges to the termination decree by failing to explicitly list them in his statement of issues, it is clear Father intended to challenge the decree. *See* Pa.R.A.P. 2116 (indicating that "[n]o

_____

[4] Father filed corresponding Pa.R.A.P. 1925(b) concise statements of errors with his notices of appeal. *See* Appellant's Statement of Issues Presented on Appeal, 11/21/2020. The court issued its Rule 1925(a) opinion on March 1, 2021.

question will be considered unless it is stated in the statement of questions

involved or is fairly suggested thereby").

We apply the following standard of review when considering the

propriety of a termination decree:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

As noted above, Section 2511 of the Adoption Act governs the

involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It

requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**— The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > **(1)** The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> …
>
> **(b) Other considerations.**— The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

The Supreme Court of Pennsylvania has detailed the factors a court must consider before terminating parental rights under subsection (a)(1):

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998).

Moreover, this Court has explained that the trial court is required to "consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). Likewise, this Court stated the trial court "must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* (citation omitted).

Here, Father's incarceration clearly plays a large role in his interaction with Child. In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), the Pennsylvania Supreme Court relied on a prior decision, *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975) to examine the parental rights of incarcerated persons. In *McCray*, the Supreme Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is presently codified at Section 2511(a)(1). The *S.P.* Court stated:

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child. We observed that the father's incarceration made his performance of this duty more difficult.

**S.P.**, 47 A.3d at 828 (citations and quotation marks omitted). The **S.P.** Court also quoted **McCray** for the following principle:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

**S.P.**, 47 A.3d at 828 (quoting **McCray**, 331 A.2d at 655).

Father contends the trial court erred in terminating his parental rights for several reasons. First, he asserts that the CUA case manager who testified at the termination hearing "appeared to have extremely limited information regarding the relationship between" Father and Child. Appellant's Brief, at 13. For example, he states that the CUA case manager only had one conversation with Father during the pendency of the case. **See id.**, at 14. Furthermore, the case manager was supposed to contact the prison to set up a visitation between Father and Child, but she never got in contact with individuals at the prison until the day of the termination hearing. **See id.** Moreover, he highlights the fact that Mother was able to reach him in prison so that he could speak with Child, but the CUA case manager could not do so. **Id.**, at 15-16.

- 10 -

In other words, he challenges the credibility of the case manager's testimony to support the court's findings.

Second, Father argues that contrary to the court's conclusion, there was a bond between Father and Child because "he testified that he knew Child from birth, took care of her, and that she told him that she loved him, when they would speak by telephone[.]" *Id.*, at 18. He alleges that such speculation regarding the lack of a bond "could turn out to be harmful" to Child as she gets older and "perceives that her relationship with her father was unfairly and superficially severed forever, and that she had no input in that decision." *Id.* Therefore, he states that was no legal basis to support the court's determination pursuant to Subsection 2511(a)(1).

Lastly, Father claims he engaged in substantial rehabilitative programs so that he could reasonably reunify with Child in the future. He states he "used self-help to keep his only objective of keeping in contact" with Child and he "received absolutely no assistance from CUA or DHS who refused to do any form of reasonable outreach or coordination." *Id.*, at 19. He concludes that because he was compliant with his objective of keeping in contact with Child, "as well as using self-help to address and alleviate any other 'possible' dependency issues, there was no basis for the termination of his parental rights under [Subsection] 2511(a)(2)." *Id.*, at 20.

Rejecting Father's characterization of the record, the trial court summarized the evidence supporting its determination under Subsection 2511(a)(1) as follows:

The petition for involuntary termination was filed for Child on September 5, 2019. For the six months prior to the filing of the petition, Father's sole SCP objective was to maintain contact with Child. Father was aware of this objective. Father has been incarcerated at SCI Pine Grove for the life of the case. Father has had contact with Child via telephone by calling Mother during Mother's supervised visitation with Child and Mother would allow Child to use her telephone to speak with Father. Father claims that he was never provided a telephone number to contact Child directly. However, Father was aware of the CUA agency's telephone number because he had previously participated in an SCP meeting with CUA via telephone. The CUA case manager confirmed that to establish the protocol for Father to contact Child via the foster parent ("Foster Parent"), the CUA case manager needed to connect with Father's social worker at SCI Pine Grove. The CUA case manager indicated that although she made outreach on numerous occasions, she was unsuccessful in establishing contact with Father's social worker until December 17, 2019, the day of the termination and goal change trial. Since the only telephone calls that took place between Father and Child occurred using Mother's telephone during Mother's supervised visits, CUA has not observed the interaction between Father and Child. Father has an affirmative duty to overcome his obstacles while incarcerated in good faith to maintain contact with Child. Father is aware that the procedure at his facility is to place himself on the prison telephone call sheet on a regular basis. Father failed to follow this procedure. Father was aware that Child was in care because he had previously participated in a CUA meeting by telephone. Father's parental duties include finding ways during his incarceration to contact Child. Father could have reached out to his prison counselor or attorney, but he did not take those affirmative actions. Father relied on Mother to have her cell phone during Mother's visits to contact Child. However, when Mother told Father she could not have her cell phone, Father stopped calling. Pennsylvania case law does not ask a parent to perform the impossible, but a parent must act reasonably and in good faith. Father has not written to Child nor sent gifts for birthdays or holidays. Father has not made outreach to the agency to ask about

> Child. Father claimed that he never made outreach because he did not have the contact information for the agency. Although Father did claim that he attempted to write to the Assistant City Solicitor ("ACS") assigned to this matter, he claimed that he sent the letter approximately two months prior to the termination and goal change trial. Based on Father's claim, this letter was sent sometime in October 2019, after the filing of the petitions. Father has not spoken with the CUA case manager since the initial SCP meeting in January 2018. Father has failed to consistently maintain a relationship with Child while he has been incarcerated. Father claimed that while in prison, he has completed rehabilitation programs, including violence prevention, parenting, drug and alcohol, and victim awareness. Father claimed that he received certificates indicating he completed these programs, but none of these certificates were provided at trial. Child needs permanency, which Father … is unable to provide as he has failed to consistently engage in his sole objective to maintain contact with Child. Father has not taken the appropriate steps necessary to put himself in a position to be reunified with Child when he is released from prison. Father's projected release date is July 30, 2023. For the entire six-month period prior to the filing of the petitions, Father either failed or refused to successfully complete his sole objective and place himself in a position to parent. As a result, the trial court did not err or abuse its discretion by finding clear and convincing evidence that Father, by his conduct, had refused and failed to perform parental duties and has evidenced a settled purpose to relinquish his parental claim to Child, so termination under [Subsection] 2511(a)(1) was proper.

Trial Court Opinion, 3/1/2021, at 7-8 (citations omitted).

Our review of the certified record supports the court's factual findings and its conclusion of sufficient grounds for termination under Subsection 2511(a)(1). First, Father's argument concerning the credibility of the CUA case manager's testimony lacks merit. The Supreme Court has previously "observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over

numerous other hearings regarding the child and parents." ***S.P.***, 47 A.3d at 826. Accordingly, it is not within our purview to reweigh the evidence and the credibility determinations of the trial court to find an abuse of discretion. ***See id.***, 826-827.

Second, we emphasize that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***In re Z.P.***, 994 A.2d 1108, 1125 (Pa. Super. 2010). More importantly, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004). It is evident that Father did nothing to assert his parental rights to Child until he was faced with possibility of losing his legal status as her father. Child has not been in Father's care since 2015. As the trial court pointed out, it only imposed one objective on Father during the life of the case and that was to maintain contact with Child. Father's actions were substantially deficient with respect to achieving this objective.

Furthermore, the record demonstrates that Father's incarceration did not create an impracticable situation where he could not avail himself of the opportunities to contact Child. While he may have not had his own phone, he did have access and opportunities to procuring Child's phone number. Indeed,

he was able to call Mother when she had supervised visits with Child. Additionally, while Mother was subsequently not able to bring her phone during visits, Father did nothing to try to contact Child through other avenues. Father even failed to send cards or gifts to Child during this lengthy period.

Upon careful and independent review of the record, we conclude the evidence clearly established that Father showed a settled purpose of relinquishing his parental rights, and therefore, we find no abuse of discretion in the trial court's evaluation of Subsection 2511(a)(1) with respect to Father.

Because we need only agree with the court as to one subsection of Section 2511(a), we need not address Father's argument concerning Subsection 2511(a)(2). ***B.L.W.***, 843 A.2d at 384.

While Father's argument is not a model of clarity, he does also implicitly challenge the court's conclusion that termination is in Child's best interest under Subsection 2511(b). ***See*** Appellant's Brief, at 18. Under Subsection 2511(b), the trial court was required to assess how the termination of Father's parental rights would impact Child. As such, the court was required to determine whether Child was emotionally bonded to Father, and further, whether severing any such bond would be detrimental to Child's needs and welfare. ***See Interest of J.R.R.***, 229 A.3d 8, 12-3 (Pa. Super. 2020). However, any emotional bond between Father and Child is only one aspect of the analysis; the court was also required to assess Child's need for safety, comfort, and stability. ***See id.***, at 13.

The trial court found that "Child and Father do not share a parent-child bond" and that it is in Child's best interest to terminate Father's parental rights. Trial Court Opinion, 3/1/2021, at 13 (citation omitted). The record amply supports these findings. Child and Foster Parent are bonded emotionally. *See* N.T., 12/17/19, at 37-9. Foster Parent provides for Child's daily needs as well as safety, stability, care and comfort. *See id.* Child also shares a bond with Foster Parent's family, with an especially close bond to Foster Parent's daughter. *See id.*

In contrast, Father has been incarcerated for the entire course of the dependency proceedings. *See id.*, at 28. The last time Father had physical contact with Child was in 2015. *See id.*, at 70. Father has not written to Child or sent any gifts. *See id.* at 63-64. While Father testified that he had taken parenting and drug and alcohol programs during his imprisonment, he presented no proof that he had completed any such programs. *See id.*, 64-65. Nor has Father presented any evidence that he is prepared to assume responsibility for Child once he is released from prison. *See id.*, at 32. Under these circumstances, we can find no fault in the trial court's conclusion that termination of Father's parental rights is justified pursuant to Subsection 2511(b).

As we conclude that none of Father's challenges merit relief, we affirm both the goal change order and termination decree.

Order affirmed. Decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2021